[No. 2033.]

BOB WHITE v. THE STATE.

1. PRACTICE.— CHARGE OF THE COURT UPON THE WEIGHT OF EVIDENCE is not necessarily cause for reversal unless it appears by bill of exceptions that it was objected to at the proper time in the court below, in order to enable that court to correct such charge or withdraw it from the jury. But see the statement of the case for a charge *held* not to be vulnerable to the objection that it is upon the weight of the evidence, inasmuch as the objectionable clause is fully corrected by the remaining portions of the paragraph.

2. SAME — ALIBI.— If the court below, having misdirected the jury in its general charge as to an issue in the case, gives a special charge at the request of the defendant which embodies correctly the law upon the question, the defendant cannot be heard to complain of the misdirection in the general charge. See the statement of the case for the original and special charges upon the question of *alibi.*

3. PRACTICE IN THIS COURT — NEW TRIAL — NEWLY DISCOVERED EVIDENCE.—
The defendant's motion for new trial based upon newly discovered evidence
was contested in the court below upon affidavits *pro* and *con.* *Held,* that
this court will not interfere with the ruling of the trial court upon such
question of fact in the absence of a clear showing that the ruling was
erroneous.

4. THEFT — FACT CASE.— See the statement of the case for evidence *held* suf-
ficient to support a conviction for horse theft.

APPEAL from the District Court of Fannin. Tried below before
the Hon. D. H. Scott.

The conviction in this case was for the theft of a horse, the prop-
erty of Newton Wilkes, in Fannin county, Texas, on the 4th day of
August, 1884. A term of six years in the penitentiary was the
penalty assessed.

Newton Wilkes was the first witness for the State. He testified
that he lived in Fannin county, Texas, and knew the defendant,
whom he identified in open court. A horse was stolen from the
witness in Fannin county, on the night of Monday, August 4, 1884.
That animal was the personal property of the witness, and was
taken from his lot on the night stated, without his knowledge or
consent. The animal was a yellow gelding, fifteen hands high, be-
tween nine and ten years old, blaze-faced, and black striped on the
back. He was branded H H on the left shoulder. The witness
last saw that horse, before he was taken, about dark on the night of
August 4, 1884, and missed him early on the next morning, Tuesday,
August 5th. Witness's brother Mat went to Bonham and had the
sheriff of Fannin county to issue and mail descriptive circulars.
Witness and others got on the trail of the horse and tracked him
some three and a half or four miles in the direction of Stephens-
ville. The witness next saw his horse on the following Sunday in
Mineola, Texas, in possession of City Marshal Cogburn, who deliv-
ered the horse to witness.

Mat Wilkes was the next witness for the State. He testified that
between 11 and 12 o'clock on the night of Monday, August 4, 1884,
he saw Newt. Wilkes's yellow gelding tied to a wagon in Newt.'s
lot, and fed him some oats. He missed that horse early on the fol-
lowing morning. He was taken from the lot between midnight of
August 4th and daylight of August 5th. Witness had been to meet-
ing at Owens Chapel, and saw and fed the horse as stated on his
return to Newt.'s house. Witness next saw the horse on the follow-
ing Wednesday week, when Newt. Wilkes got home with him.
There was a bright moon on the night of August 4, 1884.

Moses Brashier was the next witness for the State. He testified
that at present and for two years he had been living about three
miles east of Mineola, in Wood county, Texas. For two nights and
one day in the month of August, 1884, the witness had possession
of the horse described in the indictment in this case. About dark
on the evening of Thursday, August 7, 1884, a man came to the
witness's house, and left the horse with witness, to be called for
when he returned in a few days. The man rode up to the witness's
house from the south, got down from his horse, came in and asked
for a drink of water. He took a seat on the porch, talked awhile,
took another drink of water, and finally said that he was sick, and
that, as he generally got very sick when he got sick at all, he wanted
to go home. He then made some inquiries about trains and stock,
and finally, after remaining at the witness's house until after night
set in, he asked witness to take and keep his horse until he called
for him, which he would do in a few days. Witness at first declined,
pleading that he had no place to keep the horse. The man insisted
that the witness should take and use the horse for his keep until he
called for him, and witness finally consented. He then asked the
witness his name and entered it in a day-book, to do which, the
witness having no other light, got him a pine wood light, and held
it while he wrote the witness's name in a day-book. Witness ob-
served the man closely while he wrote. Witness's daughter also
watched the man while he wrote, and laughed at him, and afterwards
told the witness, who could not write, that she laughed at the bad
writing of the man and his incorrect spelling of witness's name.
Witness's wife told witness that he should have made the man give
his name, which witness neglected to do. The man was young,
dark complected, was spare of build, wore a small moustache, dark
clothes and a low-crowned, broad-brimmed black hat. The left
sleeve of his coat, between the elbow and shoulder, was torn, as
though rent by brush. He had a gun and saddle-bags, which he
took off with him. When he left witness's house on that night, he
got on the railroad track and went west towards Mineola. Witness
could hear him walking on the railroad ties for several hundred
yards in the direction of Mineola — a pair of large bell-spurs he
wore making considerable noise. That man first passed witness's
house on that day about two hours before sundown, going south, at
which time witness was at work at the back part of his field. The
main Mineola road, going east, lay north of witness's house, about
a mile. Another road lay south of the witness's house about a
quarter of a mile. The road running north and south, on which

the man came to witness's house, was a neighborhood road. The witness had just pulled off his boots when the man came to his house on the evening in question. There was no light about the house except the torch light above alluded to, but it was still light enough for the witness to see, when the man first stopped at his gate, that he was a white man. The timber about the witness's house had been cut away.

The bar of the court room was full of persons, and the defendant was seated in a chair directly behind that taken by the witness when brought from the room in which the witnesses were held under the rule. The prosecuting counsel told the witness to stand up and point out the man who left the horse at his house, if that man was in the court room. Witness stood up, and, after looking over the room, pointed to the defendant and declared him to be the man who left the horse at his house in Wood county, Texas, on the night of August 7, 1884. Shortly after witness turned the horse over to Mr. Cogburn, which he did after having the horse in his possession two nights and one day, that gentleman showed witness a photograph, and asked if witness knew whose picture that was. Witness, without having seen the picture before, and without taking it in his hands, replied to Cogburn: "That is the picture of the man who left the horse at my house." Witness was taken to Bonham not long after the horse was turned over to Cogburn, and, in the presence of the sheriff, was confronted with a number of prisoners, among whom he readily identified the defendant on trial as the party who left the horse at his house, as stated. Witness next saw and identified the defendant at the last term of court. He remembered and recognized the defendant by his features, and not from the impression made on his mind by the picture.

The witness was subjected to a very rigid cross-examination by the defense, but it wrought no material variance in his testimony in chief, nor elicited other statements of consequence.

Eliza Brashier, the wife of the last witness, testified, for the State, that the defendant, riding the horse mentioned in the indictment, came to her house on the evening of August 7, 1884, about two hours before sunset. He got down from his horse, came into the house and asked for a drink of water, saying that he was tired and sick. Witness's mother gave him some water, and he then asked some questions about horse-stock. He soon left, going south. He came back after dark, the witness did not know from which direc-tion. He sat down on the porch and said that he wanted some more of that good water. He then asked witness's husband to take and

keep his horse for him, and when he left he left his horse. Witness looked at him critically. He had on a brown looking coat, a black hat, and light colored " overalls," which looked faded. One of the sleeves of his coat, between the elbow and shoulder, was torn. He remained at the house an hour or two. He left a saddle and an old sack, besides the horse, but carried off his gun and saddle-bags. He wore then, as well as witness could now remember, a small moustache and chin whiskers. Witness then pointed out the defendant as the man who brought and left the horse at her house.

Cross-examined, the witness testified that she, her husband and daughter, were present on the gallery of their house while defendant was there on the evening of August 7, 1884. They had no fire in the house, and the witness did not, on the former trial of this case, swear that they did have a fire. Witness did not see the defendant write his name. Witness's daughter disputed with her father about his testimony on the former trial as to what she, the said daughter, said about the writing. The daughter claimed that she did not say at the time that the name was written wrong, but that she did say it was poor writing — or perhaps she reversed it, and claimed that she did not say the writing was bad, but did say that the name was written wrong. Witness did not remember what, but did remember that something passed between her husband and daughter about the writing and her husband's testimony in regard thereto. The witness last saw the defendant, prior to this trial, in the yard of the court-house in Bonham, when she identified him in a crowd of other prisoners and pointed him out to the sheriff. Witness knew him the instant she saw him. The witness saw and recognized a picture of the defendant in the possession of the marshal of Mineola, shortly after the horse was turned over to the marshal by witness's husband.

Hannah Farrar, the mother-in-law of Moses Brashier, testified, for the State, that she lived about one hundred and fifty yards distant from Moses Brashier in August, 1884. Witness remembered the occurrences at Brashier's house on the 7th day of that month. The defendant came to that house in the evening, got two drinks of water, and said that he was tired and sick. He got down from his horse, and witness handed him the water. He came to the house from the north, and, leaving, went down the railroad. He remained but two or three minutes, and made no inquiries that witness heard. He had a gun and a fine black coat tied behind his saddle. One of the sleeves of his coat, the right sleeve witness thought, was torn. The man on trial was the man referred to by witness. Witness would know him under any and all circumstances. She recognized

him at the last term of this court. She recognized his picture in the possession of Mr. Cogburn, a few days after he left the horse at Brashier's.

Cross-examined, the witness testified that the man who came to Brashier's house on the day, and in the manner stated, was clean shaven. His eyes were dark and his hair was shingled close. He did not take his hat from his head. He wore a fine black coat, brown pants and a pair of boots. Witness observed no foam on the horse, but saw stripes down his back and on his legs. When the Brashiers and witness went home after the trial at the last term of court, Moses Brashier's little daughter laughed at him about his testimony on that trial. She said the man did not spell Moses Brashier's name right. The defendant, when he came to Brashier's house, had a gun and a pair of saddle-bags with him. There was a small hole in one of his boots. He wore a small black moustache, and a small patch of whiskers on each side of his face.

Isham Tell testified, for the State, that he lived in Wood county, scarcely a mile north from the house of Moses Brashier. Witness recollected the fact that a man, during August, 1884, left a horse with Brashier. He saw the man and horse, but took no particular notice of either. They crossed the road a short distance ahead of witness. The man was of ordinary size and spare built. Witness declined to point out any particular man in the court room as the man he saw cross the road ahead of him on the occasion referred to, as he was not at all certain he could do so.

Harrison Russell testified, for the State, that he lived about three and a half miles east of Mineola, and about one and a half miles distant from Moses Brashier's house. Between sundown and dark one evening early in August, 1884, he saw a young man of dark complexion riding a good sized yellow horse with dark mane and tail, and striped on the back and legs. The young man wore a small moustache, but no whiskers. The witness was overtaken on the common in the vicinity of his house by the man, who said that he was lost, and asked directions. The witness was not sure that he had seen that man since, but it was his impression that the defendant was the man.

Cross-examined, the witness said that his house was southwest from Brashier's. The road from his house to Brashier's was not the road to Mineola. The man when he left the witness went towards Brashier's. It was nearer dark than sundown when the man left the witness going towards Brashier's. The interview between the man and witness lasted but a moment.

A. F. Tucker testified, for the State, that on the night of August

7, 1884, at about 10 o'clock at night, he saw a young man at the door of the car shop at the Mineola depot, and heard him make inquiries concerning the departure of trains for Terrell and thence to Bells. The young man told the witness that his name was Mapes. Witness, having a nephew of that name, directed considerable attention to the young man, thinking possibly there might be some relationship between them. The young man wore dark clothes, one of the sleeves of his coat being torn. He wore a small moustache, and had a gun in his hand, which attracted the witness's attention. Mineola was about ninety miles distant from Bells. Witness had the defendant to speak the word "Mapes" on a former trial, and took his voice and that of the young man described to be the same. The witness then pointed out the defendant, and said that while he would not positively swear that he was the same young man, he was morally satisfied that he was. Mr. Utley and others were present and heard the conversation between the young man and the witness at the car-shop doors. It was night, but witness, Utley and others had lanterns in their hands.

Mr. Utley testified, for the State, that on the night of August 7, 1884, between 10 and 12 o'clock, he saw a young man talking to Mr. Tucker at the car-house door in Mineola. That young man asked about the train to Bells. He had a gun in his hands, was youthful in appearance, and dressed in dark clothes, one of the sleeves of his coat having a V-shaped rent between the elbow and shoulder. The witness saw the same young man on the next morning, when he put his gun in the express car, and got on the train going to Bells. That train left Mineola at half-past 6 on that morning, on a schedule speed of twenty-five miles per hour. Bells was ninety miles distant from Mineola. The young man on trial was, in the opinion of the witness, the same young man.

Cross-examined, the witness said that he had a light which he held down in his hand. He saw the young man but a few moments on the night of August 7, 1884, and again as he boarded the train on the next day. Witness could not positively swear that the defendant was that young man, but he firmly believed him to be.

Frank Blair testified, for the State, that he was sheriff of Fannin county when the defendant was arrested and jailed for the theft of Wilkes's horse. The horse was recovered through Mr. Cogburn, the city marshal of Mineola. Witness was present when Moses Brashier was brought to the Fannin county jail the first time. Witness had three prisoners, including the defendant, brought out and passed before Brashier. Brashier identified the defendant as the

man who left the horse at his house on the 7th day of August, 1884. Witness did not put Brashier in the jail with the other prisoners, but intimated to him that the defendant would be in the crowd of prisoners when brought out. The State rested.

Mrs. Nicie White, the defendant's mother, was his first witness. She testified that she lived about eighteen miles from Bonham and about three miles from Newt. Wilkes's house in Fannin county. Witness knew nothing of the theft of Wilkes's horse until the arrest of the defendant. The theft was said to have been committed on the Monday night after the primary election in August, 1884. The defendant was at home, at the witness's house, on that evening until after supper. After supper he went to the house of John Shaw, a neighbor, and returned home between 10 and 11 o'clock. Harry Campbell went to Shaw's with defendant, and returned with him and remained all night. Defendant did not leave witness's house again until witness and her family, including defendant, started to Grayson county, next morning. Defendant, Tom Burrell, his wife and witness's small granddaughter were in a wagon together. The party reached Bells on Tuesday, and spent Tuesday night, Wednesday and Wednesday night, at Bill Burrell's house. On Thursday the party went to the house of witness's son Charley White on Choctaw creek. They met Charley White on the way, when the defendant got on his horse and rode with Charley until they reached Mr. Moss's house. The party met Charley between 11 and 12 o'clock. Witness and those with her got separated from defendant and Charley on the way, but reached Charley's house near the same time. Wit-. ness saw the defendant at intervals during the entire stay of the party at Bells.

Cross-examined, the witness said that she remembered dates tolerably well. The defendant was at home on the night of Monday, August 4, 1884, except for the short time he spent at Shaw's house. He cut millet in the field all day on Monday. He went to Shaw's on foot to see Shaw about some hay. Witness, defendant, Tom Burrell and his wife, witness's granddaughter Margaret Reeder, and two small children went to Bells together in a wagon. They had the wagon sheet pinned up to admit air. Defendant had a saddle in the wagon and led a horse. The party left home on Tuesday morning after breakfast. Tom Burrell did not go home on the next day. The party reached Charley White's on Thursday and left for home on Friday morning, and reached Owens Chapel about dark on that evening. On their way to Charley's the party met Charley near Moss's house. Harry Campbell and Dosia Reed's husband

slept with the defendant and his brother, Newt. White, on the witness's porch, on the night of Monday, August 4, 1884. John Shaw came by witness's house after defendant and Newt. had got home. United States revenue officer Dodson was at Charley White's when the witness and her party arrived. Defendant could neither read nor write, though he went to school a short time to E. E. Blair, and learned to spell a little.

Harry Campbell testified, for the defense, that he lived northeast from Bonham and about a mile distant from the residence of the mother of the defendant. Witness remembered the night on which Wilkes's horse was said to have been stolen. Witness was with the defendant throughout the whole of that night. He went with defendant and Newt. White to John Shaw's, and returned with them, and slept with them all night. Defendant started with others of his family to Grayson county, after breakfast on the following morning. He led his horse to Grayson county, or, at least, when he started he was leading his animal. Witness did not go with them, but went to Bois d'Arc creek.

Cross-examined, the witness testified that he lived at Mrs. White's in August, 1884, and had then lived there some four or five months. Defendant cut millet all day of Monday, August 4, 1884. Witness slept with defendant that night on a pallet on the porch. John Shaw came by Mrs. White's between 10 and 11 o'clock on that night. Defendant did not go to preaching on that Monday night. The parties who started to Grayson county on the morning after the theft were Mrs. White, Tom Burrell and wife, Margaret Reeder, two children and the defendant, who rode in the back end of the wagon and led his horse. The parties named got back to Mrs. White's on Friday night. The Shaw family, except Shaw himself, were at home when witness and defendant went there on Monday night. Witness and defendant were good friends.

Newt. White, a brother to the defendant, testified in his behalf that he, defendant and Harry Campbell went to Shaw's house together on the Monday night on which Wilkes's horse was said to have been stolen. They left home, going to Shaw's, between sundown and dark, and stayed there until 10 o'clock. Shaw was absent but his wife and daughter were at home. Defendant, witness and Harry Campbell went home together from Shaw's, and slept together. Witness ate breakfast at home on the next morning. Defendant went to Jim White's to get his horse shod, and ate breakfast there. The several parties named by previous witnesses for the defense left for Grayson county on that morning, leaving wit-

ness at home.  Defendant rode in the wagon with the others, and led his horse.  The parties returned home from Grayson county on Friday night.

Cross-examined, the witness said that he occupied his time on Monday, August 4, 1884, binding millet.  Defendant quit cutting millet when the sun was about thirty minutes high.  Harry Campbell cut and bound a small quantity of millet.  The parties who went to Grayson county worked one of Tom Burrell's horses.  Defendant led his horse, and took witness's saddle, leaving his own saddle at home.  The three horses were taken to Grayson county in order that Tom Burrell could ride one home, leaving the other two to be worked with the wagon.  Defendant lived between thirty and thirty-five miles from Bells.  Charley White lived about ten miles north from Bells.  Harry Campbell went across Bois d' Arc on Tuesday morning, after defendant left for Grayson county.

Tom Burrell testified, for the defense, that he was a brother-in-law to the defendant.  He remembered the theft of Newt. Wilkes's horse. It was said to have been stolen on the night of Monday, August 4, 1884.  Witness was at his mother-in-law's house on that Monday. Defendant, Newt. White and Harry Campbell were also there.  Witness saw the defendant working in the millet field on that day. Witness declined to stay to supper, as his wife was waiting supper for him, and he left for home a few moments before supper was served at Mrs. White's.  On the next morning (Tuesday) witness and the parties named by previous witnesses, including the defendant, went in a wagon, the defendant leading his horse, to Grayson county, to see Charley White, witness's brother and other relatives. The party reached Bells between sundown and dark on that Tuesday evening.  They passed that night, Wednesday and Wednesday night, at Bill Burrell's house.  Defendant was with the party the whole of the time, and slept at Bill Burrell's house on Tuesday and Wednesday nights.  On Thursday morning, August 7th, the party started from Bells to Charley White's place on Choctaw creek. En route the party met Charley, who said that he was going to Moss's, and asked defendant to go with him.  Defendant saddled the led horse and went with Charley.  Witness and the others of the party went on to Charley's house, where they were soon joined by Charley and the defendant.  The party, including defendant, spent Thursday night at Charley White's, and started home on Friday morning.  A Mr. Dodson, a United States revenue officer, and his wife, stayed at Charley's on that same night.  The same party that went from home on Tuesday, including defendant, got

home on Friday night. Witness knew as a positive fact that defendant was with him, his wife, mother-in-law and the others named, from Tuesday morning, August 5th, until Friday night, August 8th, and was not in Wood county during that time. He was at Charley White's in Grayson county, Texas, on Thursday night, August 7, 1884, and could not have been anywhere in Wood county. It was the original intention that the party should get back from Grayson county on Friday.

Cross-examined, witness testified that when they started from home on Tuesday morning it was the intention of the witness to return from Bells, and for that purpose the extra or led horse was taken along. The others expected to go on to Kentuckytown. The arrangement was altered, and the party returned together on Friday. *En route* on Tuesday morning, the witness saw Parson Owens standing some fifteen or twenty yards from the church. Defendant, Newt. White and Harry Campbell went to John Shaw's. Witness saw defendant at Jim White's shop on Tuesday morning, having his horse shod. The wagon used on the trip to Grayson county was a borrowed vehicle, and defendant had promised to return it on Friday. He hurried back from Grayson county on this account.

Mrs. Tom Burrell, the wife of the last witness, and sister of the defendant, testified that the defendant was one of the party who traveled with her in the wagon to Grayson county, Texas, on Tuesday, August 5th. This witness described the movements of the party, including the defendant, from Tuesday morning until Friday night, and stated that, to her positive knowledge, the defendant was not in Mineola or Wood county on Thursday, August 7, 1884.

Cross-examined, the witness testified that she was at her mother's house on Monday evening, August 4th, and took supper there. Defendant, Newt. White and Harry Campbell went to Shaw's after supper, and returned before witness went home. Witness went home with her husband and children. She was sure of this. When the party started to Grayson county, their purpose was to remain a week or two, and it was not an understanding that they were to return on Friday. The wagon used on that trip belonged to the defendant.

James White, defendant's brother, testified in his behalf that defendant was at his blacksmith shop on the morning of Tuesday, August 5, 1884, and witness shod his horse in front. This was before sunrise. He ate breakfast at the witness's house.

Bill Burrell testified, for the defense, that he was a railroad section hand in August, 1884, and lived at Bells. Defendant, his

mother and sister, and Tom Burrell and his wife, stayed at witness's house in Bells on Tuesday night, August 5th. Witness went to work on Wednesday, and found the parties, including the defendant, still at his house when he returned at night. They were all there when witness went to work on Thursday morning, and were gone when he returned that night. Charley White lived about nine miles from Bells.

Mrs. Shaw testified, for the defense, that she was at home near Mrs. White's house in Fannin county on the night of August 4, 1884. Her husband was at preaching at the Owens Chapel. Defendant and his brother Newt. and Harry Campbell came to witness's house that night between sundown and dark, and left at fifteen minutes before 11 o'clock. Mary Wyatt was at witness's house at the time. Witness's husband went to Tomlinson's and thence to church, and got back home before 12 o'clock.

John Shaw testified, for the defense, that he was at church on the night of Monday, August 4, 1884. Defendant was not at church. Witness passed Mrs. White's house that night about 12 o'clock, and saw defendant, Newt. White and Harry Campbell on the gallery. Witness stopped at Mrs. White's to see defendant about some hay. Witness did not tell defendant that night that Mat Wilkes was at church. Witness was tried for the theft of this horse, with defendant, at the last term of court, but was acquitted.

J. J. Tomlinson testified, for the defense, that he went to preaching at Owens Chapel on the night of Monday, August 4, 1884, with his family, Mr. Giles Thomas, and Mr. Shaw, who came to his house. The defendant was not at preaching on that night. John Shaw and witness were brothers-in-law.

John Gamble testified, for the defense, that he had a blacksmith shop in Bells in August, 1884. Defendant had his horse shod at that shop on the 8th of that month by Jerry Norton, witness's smith. The shoes were put on the two hind feet. Southers came to the shop on that evening to have some work done, and witness, having this work to do for defendant, told Southers to come back next morning; which he did. Witness located the dates by means of his account book. The witness may have varied a day or two in entering the charge against Southers on his book. That entry showed the charge on the 9th, though the work may have been done a day or two before that date.

Mr. Southers testified, for the defense, that he saw the defendant at Gamble's shop in Bells on the 7th or 8th of August, 1884. He went to that shop on that evening to get some work done, but in consequence of the smith being engaged on defendant's horse wit-

ness was told to return on the morrow, August 9th, which he did. The work was charged against him. Witness located the date by the entry on Gamble's book, but could not swear that the entry was correct as to date.

Lindsey testified, for the defense, that he was in the employ of Gamble, in Bells, when defendant, with the others of the White family, came to Bells. He did not know the date of their arrival, but it may have been the 6th or 7th of August, 1884.

John Moss testified, for the defense, that defendant and Charley White were at his father's house near Bells on August 7, 1884. Charley White introduced defendant to the witness at that house on that day.

Cross-examined, the witness testified that the defendant and Charley White ate dinner at his father's house on August 7, 1884. Witness recalled the date by the fact that his brother executed a promissory note on that day, and from the fact that a tombstone peddler was at the house on the same day. Witness's father and Charley White were associated together in the manufacture of whisky.

Bill Moss testified, for the defense, that he lived one mile northeast of Choctaw Station. Witness started from home to Bells on the 7th day of August, 1884, between 12 and 2 o'clock. He met Charley White and the defendant about four hundred yards from his house. Charley White introduced the defendant, whom witness did not previously know. Witness recalled the date by the fact that two days later he made a settlement with Mr. Ferguson on a note, by a sale of some property, and that settlement was made August 9, 1884, as shown by witness's account book.

E. E. Blair testified, for the defense, that the defendant was a pupil of his about seven years prior to this trial. He could neither read nor write then, and witness did not think he had ever attended school since. The defendant closed his testimony by putting in evidence several business papers, notes, etc., executed by him prior to August 7, 1884, all of which were subscribed by him with his mark.

The State introduced Mr. —— (name not stated), in rebuttal. He testified that he saw the defendant at church at Owens Chapel on the night of August 4, 1884. He was with John Shaw. Witness was certain he saw defendant at church on that night, and was certain that it was Monday night, August 4, 1884, because he knew that he carried to Bonham on that Monday the returns of the primary election in that precinct, held on the previous Saturday, August 2d, and it was on his return that he stopped at the church.

J. J. Graham, for the State, in rebuttal, testified that he saw the defendant at services at Owens Chapel, just after dark on the night of August 4, 1884.

Louis Moore, Tom Patterson, John Walker, Charley McKinney, Mat Wilkes and Henry Owens testified, for the State, in rebuttal, that they saw defendant at Owens Chapel during services on the night of August 4, 1884. Patterson deposed that he spoke to defendant, and that defendant replied.

Parson Owens testified, for the State, in rebuttal, that on the day after Wilkes's horse is said to have been stolen, he saw a wagon pass Owens Chapel in which some of the White family were seated. Burrell, some women and children were in the wagon. If defendant was in that wagon the witness did not see him. The wagon sheet was up all around. The wagon passed within fifteen feet of witness. Witness would not swear that defendant was not in the wagon, but if he was witness did not see him.

Jim Bucham testified, for the State, in rebuttal, that defendant was at his, witness's, father's house about five years before this trial. He told witness's father on that occasion that he could write his name so that it could be read. To try him, witness's father wrote defendant's name in an old day-book. Defendant then wrote his name under the witness's father's writing.

Cross-examined, the witness said that he could not write. Witness told Dack Haynes about this incident, but no one else that he could remember. The old day-book in which the defendant wrote his name disappeared from the witness's father's house a few days before this court met, and could not now be found.

The fifth paragraph of the charge of the court, referred to in the first head-note of this report, reads as follows:

" I charge you that circumstantial evidence is, or may be, as convincing in establishing guilt as direct or positive testimony. It is requisite, however, of this character of testimony, when a conviction is sought under it, that it should exclude every other reasonable hypothesis consistent with the innocence of the defendant, and also that each link in the chain of circumstances, if established by circumstances, should be established by the same character of testimony as the main fact sought to be established, and that they should lead on the whole to a satisfactory conclusion, beyond a reasonable doubt, that the defendant, and no other person, committed the offense. Such hypothesis of a defendant's innocence must be reasonable, and not be merely fanciful, and the same must be consistent with the credible testimony in the case."

The sixth paragraph of the general charge, referred to in the second head-note, reads as follows:

"If you believe from the evidence that Newt. Wilkes's horse was stolen as alleged, but you find from the evidence that, at the time such theft was committed, the defendant was at home at his mother's house, or that he did not commit said offense, then you will find him not guilty."

The special charge upon the same subject, which was given, reads as follows:

"I further charge you that one of the defendant's grounds of defense is that he was not present at the commission of the offense charged, and if you believe from the evidence that the defendant, at the time of the taking of the horse, was at a different place from that from which the horse was taken, and could not have been the person or party who took the horse, and if the evidence raises in your minds a reasonable doubt as to the presence of the defendant at the place where the horse was taken at the time of such taking, you will find him not guilty."

The motion for new trial raised the questions discussed in the opinion.

*Grace, Campbell & Thurmond* filed an able brief and argument for appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. Appellant was convicted of the theft of a gelding, the property of one Newton Wilkes; his punishment being assessed at six years' imprisonment in the penitentiary. The record is quite voluminous and the trial appears to have been conducted with marked zeal and ability on both sides. We have given it a most thorough consideration in connection with the able oral argument and brief of appellant's counsel. It is purely a case of circumstantial evidence, and the defense was an *alibi*. Most of the errors brought to our attention are supposed defects in the charge of the court to the jury, and the principal complaints leveled at the charge call in question its sufficiency upon circumstantial evidence and the law of *alibi*.

We are of opinion that the charge is sufficient upon circumstantial evidence, and defendant should have requested a fuller and more explicit instruction upon this branch of the law of the case, if he desired it. This he failed to do. It is also objected to this

branch of the charge that it is upon the weight of the evidence. If we were to separate the first three lines of the fifth paragraph from the remaining portions of said paragraph, and consider it as an isolated charge, the objection would be most certainly well taken. The objectionable portion is as follows: "I charge you that circumstantial evidence is or may be as convincing in establishing guilt as direct or positive testimony." Such an instruction has been more than once expressly condemned as being on the weight of evidence. (*Harrison* v. *The State*, 8 Texas Ct. App., 183; *Harrison* v. *The State*, 9 Texas Ct. App., 407; *Walker* v. *The State*, 13 Texas Ct. App., 618.) A similar error was committed in *Post* v. *The State*, 10 Texas Ct. App., 580, and it was there held that a charge upon the weight of evidence is not necessarily ground for reversal unless it appears by bill of exceptions that it was objected to at the time, so as to enable the court to correct or withdraw it from the jury." (See, also, *Maddox* v. *The State*, 12 Texas Ct. App., 429.) The charge we are considering was not excepted to at the time upon the ground stated. Besides this, the remaining portion of the paragraph in which this error occurs fully corrects it, and the paragraph could not, taken as a whole, have had the most remote tendency to mislead.

As to the charge on *alibi*, defendant's criticism upon the sixth paragraph of the court's charge is doubtless correct, but upon this question of *alibi* we find defendant's counsel requested a special instruction upon the subject, which most fully submitted the law, and corrected any apparent or supposed defects in the court's charge; and this instruction was given by the court in the language in which it was asked, without alteration or modification. We cannot see that defendant has any just ground to complain in this regard.

That portion of the motion for a new trial based upon newly discovered evidence was most hotly contested by the many affidavits and counter-affidavits filed on either side. The court below was in a better situation to judge of the matter than this court could possibly be, and it has not been made to appear to us that the ruling of the court was erroneous.

We have found no reversible error in the record, and the judgment is affirmed.

*Affirmed.*

[Opinion delivered November 14, 1885.]